Morris **DUBIN**

v.

The **UNITED STATES.**

No. 68–55.

United States Court of Claims.
July 15, 1966.

George Harris, New York City, for plaintiff, Frank X. O'Donnell, Jr., New York City, attorney of record; Burke & Burke, New York City, of counsel.

Robert R. Donlan, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, WHITAKER, Senior Judge, and LARAMORE, DURFEE and DAVIS, Judges.

## OPINION

WHITAKER, Senior Judge.

This case was originally before the court on cross-motions for summary judgment. On May 3, 1961, in an opinion delivered by Judge Madden, the court denied both motions and referred the case to the trial commissioner on the limited issue of "whether the articles here in question related to the national defense * * *." Dubin v. United States, 289 F.2d 651, 655, 153 Ct.Cl. 550, 556 (1961). Subsequently, on motion of both parties, the court, by order dated March 19, 1962, amended its order of reference to authorize the trial commissioner to hear proof on the following issues:

(a) Whether the articles of property involved in this action related to the national defense;

(b) The amount of damages that plaintiff is entitled to recover in the event the court decides that plaintiff is entitled to recover; and

(c) Any other material issues of fact, as determined by the trial commissioner, which need to be resolved in order to close proof in this case; * *.

Thereafter, the case proceeded to trial and is now before the court on exceptions to the Report of Trial Commissioner Franklin M. Stone.

The genesis of the dispute involved herein was the requirement by the defendant, acting through officials of the United States Navy, that plaintiff surrender possession to it of a number of radar-transmitter units, accessory power units, and radar receivers. At the time the equipment was taken, receipts were given by the Navy Department stating that the transaction was without prejudice to plaintiff's rights, including his full right to compensation. Shortly thereafter, plaintiff presented to defendant a claim for $85,612.50, which he asserted was the fair market value of the property taken. The defendant denied the claim but offered to refund to plaintiff $3,162.62, the amount which it had received from plaintiff as the purchase price for a lot of surplus property which contained many of the repossessed items. Plaintiff rejected the offer and thereafter filed a petition in this court claiming damages of $85,612.50.

Somewhat prior to the purchase of the surplus property involved in this suit, plaintiff entered into an arrangement with his brother, Lester Dubin,

whereby his brother would advise him, and his brother's company, the Dubin Electronics Company, Inc., would act as his sales agent on the purchase and sale of surplus property. As compensation for the advisory services of Lester Dubin, and for the services of Dubin Electronics, the company was to receive one-third of the sales price.

In the latter part of June or early July 1950, Lester Dubin received a copy of a notice that the United States Air Force was going to conduct a public sale of approximately 50 lots of surplus electronic equipment at Dayton, Ohio, from July 5, 1950 to July 11, 1950. Plaintiff and his brother decided that they should both go to Dayton for the sale. At the sale the equipment had been divided into lots and a sample of each significant type of equipment in each lot had been taken out of its package to permit examination. After examining the lots, Lester Dubin advised plaintiff to enter certain bids for certain lots. In accordance with the above, plaintiff submitted sealed bids for six different lots. He was the high and successful bidder on four lots, among which was Lot No. 23, the only lot material to this case. This lot contained, among other things, 83 Mark 31 Model 1, "S" Band radar transmitter-receiver units and 136 Mark 1 Model 2, "S" Band radar receivers, type CG–46ACX, which had been purchased from the Navy by the United States Army Signal Corps in Dayton, Ohio, during 1944.

The equipment contained in Lot No. 23 was shipped from Dayton, Ohio, on July 12 and 13, 1950, and was received by plaintiff in New York on or about July 30, 1950.

At the sale in Dayton, Lester Dubin met a representative of Fair Radio Sales who informed him that it had been the successful bidder on a lot of property which contained equipment complementary to the Mark 31 Model 1, known as the PU/Mark 31 power supply unit, which it was willing to sell. After examining a sample sent him at his request, Lester Dubin, acting on behalf of plaintiff, on August 8, 1950, purchased it and eighty additional PU/Mark 31 power supply units from Fair Radio Sales for a total price of $1,600. On August 10, 1950, Dubin Electronics also purchased, on behalf of plaintiff, one sample of a dynamotor power unit from Western International Co. for $15. This power unit was purchased under an arrangement whereby an additional 135 of them could be ordered by plaintiff as he might need them as accessory units for the Mark 1 Model 2 radar receivers.

Near the end of July 1950, Lester Dubin prepared an advertising bulletin for the purpose of offering certain goods for sale to Dubin Electronics' customers. Among other things, the bulletin offered for sale two items with which we are concerned. One was the Mark 31 Model 1, purchased from the Air Force, plus the PU/Mark 31 power supply unit purchased from Fair Radio Sales. The other was the Mark 1 Model 2, purchased from the Air Force, plus the dynamotor power unit purchased from Western International Co. These items offered for sale had been altered by plaintiff in no particular, but were offered for sale in the cartons in which they were packed when plaintiff purchased them. However, the first item, consisting of Mark 31 Model 1 plus the PU/Mark 31, was offered at the unit price of $750; but the Mark 1 Model 2 was offered at the price of $175, and the dynamotor power unit to be used in connection with it was offered as a separate item for $37.50. Between August 11, 1950 and August 16, 1950, approximately 11,000 copies of the advertising bulletin were circulated to customers of Dubin Electronics.

Shortly after the advertising bulletin was circulated, it came to the attention of certain officials in the Bureau of Aeronautics, Department of the Navy. These officials requested the Third Naval District in New York City to stop all sales of the equipment and conduct an investigation of the matter. In accordance with this request, the Department

of the Navy notified Dubin Electronics to cease mailing the advertising bulletin and not to sell the equipment described as Mark 31 Model 1, and Mark 1 Model 2 or their associated power units, because they were classified equipment. Plaintiff and his agents complied immediately with this notice. Shortly thereafter, officials of the Navy Department informed plaintiff that there was a security violation involved and that the Navy intended to seize the equipment. They further informed plaintiff that he should cooperate with their effort to repossess the equipment, as continued possession of it might constitute a violation of the Espionage Act, 62 Stat. 736, 737 (1948) (now 18 U.S.C. § 793( 1964)).

As the Korean conflict was then in progress and plaintiff was concerned over a possible violation of the Espionage Act, he offered no resistance to the repossession of the equipment. Thus, on August 19, 23, and 24, 1950, the Navy took from plaintiff 83 Mark 31 Model 1, "S" Band radar transmitter-receiver units, 81 PU/Mark 31 power supply units, 136 Mark 1 Model 2, "S" Band radar receivers, type CG–46ACX, and one dynamotor power unit, type CG–211078.

At the trial before the trial commissioner, it developed that the Mark 1 Model 2 and the dynamotor power unit were components of the "Pelican" missile. The Pelican missile was the first radar homing missile developed by the United States Navy. It was known as a semi-active, or passive homing missile, because it contained only a radar receiver but not a transmitter. It homed on its target by using radar signals emitted by a transmitter carried in an associated aircraft. The Mark 1 Model 2 was one of three design versions of the radar receiver for the guidance system of the Pelican missile and the dynamotor power unit was the power supply for the radar receiver. It also developed at the trial that the Mark 31 Model 1 and the PU/Mark 31 power supply unit were components of the "Bat" missile. The Bat (upon which the Navy began to concentrate its efforts in late 1944, when, except for some experimental purposes, the Pelican project was discontinued), like the Pelican, was an air-to-surface type of homing missile. Unlike the Pelican, however, the Bat was an active or self-illuminating homing missile, since it contained both a radar transmitter and a receiver and thus was independent of an associated aircraft.

During August 1950, the Bat missile was an operational weapon in the United States defense arsenal. Possession of its radar guidance and homing system, i. e., Mark 31 Model 1 and the PU/Mark 31 power supply unit, would have allowed a skilled electronics expert to reconstruct the circuit diagrams with which he would have been able to determine how the system worked and build similar circuits. Furthermore, such an expert, in all probability, would have been able to ascertain from physical examination of the guidance system, the method or technique used to actuate the mechanism by which the direction of the missile was changed to accord with a change in direction of the target, so that the missile would home in on a moving target. This tracking device was the only one of its type available in 1950. There is little doubt that possession of the Bat guidance and homing system would have given to an unfriendly foreign power valuable, and otherwise unavailable, advanced technical information concerning missile guidance systems then in use.

Although the Pelican missile was not operational during 1950, the receiver portion of the missile, i. e., Mark 1 Model 2 worked in the same manner and performed the same functions as the receiving portion of the Bat missile. Both receivers contained the mechanism by which the direction of the missile was changed to accord with a change in the direction of the target. These mechanisms, known as tracking circuits, were identical in the radar systems of both the Pelican and Bat missiles. Possession of the Pelican receiver would have revealed important technical information about

guidance systems of then operational missiles and in all probability would have advanced missile guidance technology of a potential enemy.

While it may be said that commercial radar available to the general public in 1950 operated on the same basic radar laws as the instruments repossessed, these instruments, being components of the Pelican and Bat missiles, contained a number of elements not found in commercial radar or on the commercial market; in particular the homing devices, by which the missiles changed course with a change in course of the target, were unknown to the general public during the year 1950.

Based simply on the foregoing, we would have little difficulty in finding that the instruments repossessed by the Department of the Navy were "instruments" or "appliances" "relating to the national defense" as those terms were used in section 793 of the Espionage Act in effect during August 1950 (62 Stat. 736, 737 (1948) (now 18 U.S.C. § 793 (1964)), which made it unlawful for anyone having possession of an "instrument" or "appliance" "relating to the national defense" to refuse to surrender possession thereof on lawful demand.

■■■■ Moreover, the defendant also proved by competent evidence at the trial and our trial commissioner so found that the equipment seized by the Navy Department was "classified" in the security sense of the word,[1] i. e., the guidance system equipment of the Pelican missile—Mark 1 Model 2 and the dynamotor power unit—was classified "Restricted" in August 1950, and the guidance system equipment of the Bat missile—Mark 31 Model 1 and the PU/Mark 31 power supply unit—was classified "Confidential" in August 1950. Classification in the security sense simply means a decision made by proper authority in the Department of Defense to put a piece of defense information or material into a specific category that then makes it sub-ject to the current regulations regarding safeguarding and dissemination. The purpose of the classification system is to safeguard information from becoming known to potential enemies of the United States in the interest of national defense.

■■■■ The fact that the equipment repossessed was classified by the proper authority, coupled with the very nature of the equipment itself, leaves no room for doubt that it was related to the national defense. We hold that the 136 Mark 1 Model 2, "S" Band radar receivers, the dynamotor power unit, the 83 Mark 31 Model 1, "S" Band radar transmitter-receiver units and the 81 PU/Mark 31 power supply units repossessed from plaintiff by the Navy Department were "instruments" or "appliances" "relating to the national defense" within the meaning of section 793 of the Espionage Act.

It follows from section 793 that plaintiff's title to and possession of this equipment were "completely vulnerable." Dubin v. United States, supra. All that was required to destroy them was a demand for possession by a proper official. A refusal to deliver the equipment on demand would have been a serious crime. Plaintiff, however, turned over possession of the equipment when the demand was made, but he insists that he is entitled to the fair market value of the property taken.

■■■ The contract between plaintiff and the defendant for the purchase of Lot No. 23, which contained the 83 Mark 31 Model 1, "S" Band radar transmitter-receivers and the 136 Mark 1 Model 2, "S" Band radar receivers, contained a "Use Warranty" clause, by which the plaintiff warranted that he would not resell the purchased property at a profit. Dubin v. United States, supra. This clause limited the sales price which plaintiff could charge for any of the property which he purchased under the contract to

---

1. See findings 30–40, infra.

his cost. We think it necessarily follows that it also limited the amount which the defendant was required to pay upon repossession of the property. So far as these items are concerned, we need not consider the effect of section 793 of the Espionage Act on the amount of plaintiff's recovery nor the "Use Warranty" clause in the contract except as indicated above, because defendant states that it is willing to have judgment entered in favor of the plaintiff for $3,162.62, the purchase price for Lot No. 23. It also states that it is willing for judgment to be entered for $1,600, the purchase price of the 81 PU/Mark 31 power supply units which plaintiff purchased from Fair Radio Sales, plus $173.86, the cost of transportation, and for $15, the cost of the dynamotor power unit which he purchased from Western International Co.

Since the 81 PU/Mark 31 power supply units and the dynamotor power unit were purchased by plaintiff from private parties in arm's-length transactions between a willing buyer and a willing seller only eleven days before repossession by defendant, what plaintiff paid would seem to be the market value of these articles. Again, we think it unnecessary to consider the effect of the Espionage Act on the market value of these articles, although it is evident that it severely restricted the extent of the market.

Since defendant agrees to reimburse plaintiff for his out-of-pocket costs, we think under all the circumstances this is not only just compensation to plaintiff but is also the amount defendant is justly due to pay.

Plaintiff is entitled to recover $4,951.48. Judgment is entered to that effect.

DAVIS, Judge (concurring in the result):

I do not join in the court's opinion because, first, of the apparent holding that retention of the equipment involved here would have violated the Espionage Act even if the items were all unclassified, and, second, of the wholly unnecessary reliance on the "use warranty". I concur in the judgment because the items were in fact classified and, that being so, plaintiff is entitled, under our prior decision in this case, 289 F.2d 651, 153 Ct.Cl. 550 (1961), to recover only what he paid.

I have the gravest doubt that the controlling provision of the Espionage Act (now 18 U.S.C. § 793) could ever apply to surplus materials or equipment which the armed services sold after properly declassifying or failing to classify them. The crucial fact of declassification (or initial failure to classify) would seem to show, in itself, that the purchaser need not fear that he would trespass on the Act by keeping the goods. This is a serious criminal provision and we must be very cautious in extending it to surplus items which the public (including the purchaser) has been told, in effect, by the Defense Department need not be kept from unfriendly hands and eyes but may be revealed to all.

It is unnecessary, however, to decide that point since the equipment here was actually classified (as the court also holds, correctly but alternatively). The trial commissioner has found the items classified and I see no adequate reason for rejecting that factual conclusion. Plaintiff has made much of a listing ("46ACX") said to show that one of the major pieces of equipment was unclassified, but I am not at all persuaded that this listing applied to any of the goods involved in this case. There is no testimony to that effect; there are apparent divergences from the particular equipment before us; and there is considerable affirmative testimony that the items sold to plaintiff were in fact classified and never removed from that category.

As for the "use warranty", our earlier decision must have decided that that clause was inapplicable—the issue was distinctly raised at that time, see 289 F.2d at 653, 153 Ct.Cl. at 553—since the court held, implicitly, that if the equip-

ment did *not* relate to the national defense the plaintiff could receive market value, not merely his expenditures. If the "use warranty" limited recovery, whatever the event, to the plaintiff's costs (which the defendant was even then willing to pay), there would be no need for an elaborate trial; the case could and would have been disposed of by summary judgment five years ago in 1961. Under the law of the case, therefore, the "use warranty" is irrelevant. It is also irrelevant becauses the court specifically held in 1961, without any reliance on the "use warranty", that, if the property turned out to be related to national defense (within the meaning of the Espionage Act), the plaintiff was entitled to "a refund of his direct out-of-pocket expenditures in the abortive transaction." 289 F.2d at 655, 153 Ct.Cl. at 556. That is exactly what the court awards today.